# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CASES CONSOLIDATED |
| | : | |
| v. | : | |
| | : | |
| Diane L. Burkholder, | : | |
| Appellant | : | No. 1526 C.D. 2022 |
| | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| v. | : | |
| | : | |
| James E. Burkholder, | : | No. 615 C.D. 2023 |
| Appellant | : | Submitted: December 9, 2024 |

BEFORE:    HONORABLE ANNE E. COVEY, Judge
            HONORABLE LORI A. DUMAS, Judge
            HONORABLE STACY WALLACE, Judge

OPINION BY
JUDGE COVEY                                    FILED: February 24, 2025

Diane L. Burkholder (Wife) and James E. Burkholder (Husband) (collectively, the Burkholders) appeal from the Lancaster County Common Pleas Court's (trial court) November 17, 2022 sentencing orders in which the trial court convicted them of violating Section 206(e) of the Dog Law,[1] 3 P.S. § 459-206(e) (relating to kennel closures), and Section 8(a)(1) of the Rabies Prevention and Control in Domestic Animals and Wildlife Act (Rabies Act),[2] 3 P.S. § 455.8(a)(1) (relating to rabies vaccination requirements), and also convicting Husband of

---

[1] Act of December 7, 1982, P.L. 784, *as amended*, 3 P.S. §§ 459-101 - 459-1206.
[2] Act of December 15, 1986, P.L. 1610, *as amended*, 3 P.S. §§ 455.1-455.15.

violating Sections 207(c), 220(a)(3),[3] 401(c), and 801 of the Dog Law, 3 P.S. §§ 459-207(c) (relating to kennel records requirements), 459-220(a)(3) (refusal of entry to kennel/hiding dogs), 459-401(c) (interference with a dog warden), and 459-801 (relating to false statements). The Burkholders present five issues for this Court's review: (1) whether Wife could be convicted of any offense when she did not own or have a legal interest in the Whispering Spring Kennel, LLC (Kennel); (2) whether sufficient evidence supported that they were operating the Kennel; (3) whether sufficient evidence supported their convictions for the Rabies Act violations; (4) whether sufficient evidence supported Husband's conviction for interference; and (5) whether sufficient evidence supported Husband's conviction for making false statements. After review, this Court affirms in part, and reverses and remands in part.

**Background**

Since 2002, Husband operated the Kennel,[4] located at 316 Good Road in East Earl, Lancaster County, Pennsylvania (Good Road Property), pursuant to a Class IV Kennel License No. 2470 issued by the Department of Agriculture, Bureau of Dog Law Enforcement (Department). The Kennel's 2019 Kennel License (Kennel License) was valid through December 31, 2019.[5] The Kennel License

---

[3] Section 220(a)(3) of the Dog Law was added by Section 10 of the Act of October 9, 2008, P.L. 1450.

[4] Husband represented that he formed the Kennel as a limited liability company in approximately 2008 or 2009. *See* Reproduced Record (R.R.) at 41a.

The Burkholders' Reproduced Record page numbers do not comply with Pennsylvania Rule of Appellate Procedure (Appellate Rule) 2173, which requires that "the reproduced record . . . shall be numbered separately in Arabic figures . . . followed . . . by a small a[.]" Pa.R.A.P. 2173. In accordance with Appellate Rule 2173, this Court references the Reproduced Record page numbers herein with a corresponding *a*.

[5] "All kennel licenses shall expire on December 31." Section 206(a)(4) of the Dog Law, 3 P.S. § 459-206(a)(4). The Class IV Kennel License allowed the Kennel to have up to 250 dogs. *See* R.R. at 42a; *see also* Section 206(a)(5)(iv) of the Dog Law, 3 P.S. § 459-206(a)(5)(vi).

reflected that Husband and Wife are limited liability company (LLC) members - Husband at 100% and Wife at 0%.[6] *See* Reproduced Record (R.R.) at 23a. In March 2020, the Burkholders moved to 440 Mohns Hill Road in Reinholds, Lancaster County, Pennsylvania (Mohns Hill Road Property), without notifying the Department of the move or their intention to close the Kennel and without requesting a closing inspection.[7]

After the Department became aware that the Burkholders did not renew the Kennel License for 2020, it dispatched Department Dog Law Enforcement Warden (Warden) Christopher Seiple (Warden Seiple)[8] to the Good Road Property on March 6, 2020, to determine the Kennel's status and conduct a closing inspection. S*ee also* R.R. at 23a-24a. When Warden Seiple arrived at the Good Road Property, Husband informed him that he closed the Kennel, Warden Seiple gave Husband a closing application and, after Husband declared that he did not have time to complete the application or undergo a closing inspection pursuant to Section 206(e) of the Dog

---

[6] Husband was originally listed as the Kennel's sole member on the 2019 Kennel License. *See* R.R. at 23a. However, difficulties arose when the Department attempted to conduct mandatory inspections and obtain records for the Kennel. *See id.* Primarily, if Husband was not present at the Good Road Property, the Department had to postpone the inspections for weeks, months, and even up to a year, until Husband made himself available. *See id.* Thereafter, the Department had agreed to withdraw prior Dog Law citations in exchange for Husband adding Wife to the LLC, so the Department could inspect the Kennel and request records from Wife in Husband's absence. *See id.*; *see also* R.R. at 42a. The Burkholders' counsel added their membership percentages to the Kennel License. *See* R.R. at 42a-43a.

[7] When an owner intends to close a kennel, the owner must notify the Department which, in turn, directs him/her to conduct a closing inspection. *See* R.R. at 25a-26a. During closing inspections, the Department checks the number of dogs at the kennel, seeks information about where the dogs will be going, and verifies rabies vaccinations and licensing records. *See id.* Specifically, an owner must have a veterinarian give rabies vaccinations to each dog and issue a certificate to that effect. *See* R.R. at 22a. While at a kennel, dogs need not be individually licensed; however, when the kennel closes, each dog must have an individual license. *See* R.R. at 24a. The average closing inspection takes approximately 15 to 20 minutes to complete. *See id.*

[8] Section 102 of the Dog Law defines *state dog warden* as "[a]n employee of the [D]epartment whose primary duty is to enforce th[e Dog Law] and the regulations pursuant thereto." 3 P.S. § 459-102.

Law that day, Warden Seiple instructed him to submit it to the Department as soon as possible. *See* R.R. at 24a. When Warden Seiple encountered the Burkholders at a March 13, 2020 hearing regarding other Kennel matters, he again reminded them to submit the closing application. *See id.* Despite the Burkholders' counsel's urging,[9] Husband declined to complete the application that day. *See id.*

After discovering that the Burkholders had sold the Good Road Property on March 17, 2020, and moved to the Mohns Hill Road Property, possibly with more than 26 dogs and the Kennel's records, the Department obtained a warrant to search the Mohns Hill Road Property.[10] *See* R.R. at 24a-25a. On May 27, 2020, Warden Seiple, Warden Cory Frey, Department veterinarian Danielle Ward, D.V.M. (Dr. Ward), Detective Resh and two police officers[11] executed the search warrant for the Mohns Hill Road Property and conducted a closing inspection. While the Department's team was conducting its inspection, Husband represented to the Wardens and Dr. Ward that there were no dogs at that or any other location the Kennel owned. The Burkholders did not provide the Wardens and Dr. Ward with any requested Kennel documents. Upon visiting the Good Road Property immediately thereafter, the Wardens and Dr. Ward observed nine adult dogs.[12] The

---

[9] It is not clear in the record whether Counsel was the Burkholders' counsel at the March 13, 2020 hearing.

[10] Section 218(c) of the Dog Law authorizes state dog wardens and other Department employees to apply for search warrants issued upon probable cause, "for the purposes of inspecting or examining any kennel or for the purpose of removing any dog under [S]ection 207 [of the Dog Law (relating to kennel requirements)], and [Section 211 of the Dog Law, 3 P.S. § 459-211 (relating to kennel license revocations/refusals)]." 3 P.S. § 459-218(c). Probable cause exists when a kennel refuses entry and/or when there are reasonable grounds to believe that there are Dog Law violations. *See id.*

[11] Neither Detective Resh's nor the two police officers' full names appear in the record.

[12] Warden Seiple explained that, although the criminal complaint against Husband states that 9 dogs were located at the Good Road Property, photographs confirmed that there were actually 10 dogs. *See* R.R. at 31a. Because Husband's charges relate only to nine dogs, that is the number this Court will address herein.

Burkholders did not provide rabies vaccination certifications or individual license records for those dogs.[13]

That same day, Warden Seiple cited Wife for the following summary offenses: (1) Vaccinations Required - Rabies (Section 8(a)(1) of the Rabies Act); (2) Kennels - Closing (Section 206(e) of the Dog Law); (3) Requirements for Kennels - Records to be Maintained (Section 207(c) of the Dog Law); and (4) Interference with State Dog Warden (Section 401(c) of the Dog Law). Following a summary trial before a magisterial district judge at which Wife was found guilty and ordered to pay a fine, Wife appealed to the trial court at Docket No. CP-36-SA-318-2020. *See* R.R. at 7a-10a.

On September 9, 2020, Warden Seiple/Department, through the Commonwealth of Pennsylvania (Commonwealth or state), issued a criminal complaint against Husband for the following misdemeanor offenses: (1) 1 count of Kennels - Closing (Section 206(e) of the Dog Law); (2) 13 counts of Requirements for Kennels - Records to be Maintained (Section 207(c) of the Dog Law); (3) 9 counts of Refusal of Entry - Hiding Dogs from Agents (Section 220(a)(3) of the Dog Law); (4) 1 count of Interference with State Dog Warden (Section 401(c) of the Dog Law); (5) 1 count of False Statements (Section 801 of the Dog Law); and (6) 9 counts of Vaccinations Required - Rabies (Section 8(a)(1) of the Rabies Act). *See* R.R. at 1a-6a, 11a-15a. The trial court conducted a preliminary hearing on June 8, 2021, after which "all charges were returned to the [trial court] and docketed at [No.] CP-36-CR-[]2371-2021." Commonwealth Br. at 4. The Commonwealth agreed to prosecute Husband's charges as summary offenses and moved to consolidate his case with Wife's case.

---

[13] The Burkholders produced the requested vaccination and licensing records for the first time at the November 17, 2022 trial court hearing, two and one-half years later.

After several postponements, the trial court conducted a *de novo* summary hearing on November 17, 2022, at which Warden Seiple, Dr. Ward, and the Burkholders testified and offered evidence, including rabies vaccination and dog license records and a stipulation regarding the testimony of Glenn Zimmerman (Zimmerman), who purchased the Good Road Property from the Burkholders in March 2020.[14]  *See* R.R. at 16a-59a.  Thereafter, the trial court convicted Wife of violating Section 206(e) of the Dog Law (relating to kennel closings) and Section 8(a)(1) of the Rabies Act (relating to rabies vaccinations), and dismissed the remaining charges.  *See* R.R. at 70a.  The trial court sentenced Wife to pay $800.00 in fines relative to her conviction, plus costs.  *See* R.R. at 59a, 70a.  The trial court found Husband guilty of one count each of the six charges against him.  *See* R.R. at 11a-15a, 67a-69a.  The trial court sentenced Husband to pay $2,800.00 in fines relative to his convictions, plus costs.  *See* R.R. at 59a, 67a-68a.

On December 20, 2022, the parties filed separate appeals from their sentencing orders to this Court.[15]  Also on that day, the trial court ordered the

---

[14] At the trial court hearing the parties stipulated to Zimmerman's testimony and to the authenticity of the records, and the Commonwealth's witnesses testified regarding the records' contents and moved them into evidence.  *See* R.R. at 17a, 101a-102a.  However, by November 15, 2023 letter, this Court notified the Burkholders' counsel (Counsel) that the original record the trial court transmitted to this Court did not include the exhibits admitted at the November 17, 2022 summary hearing.  *See* 11/15/2023 Letter.  This Court reminded Counsel that it was the Burkholders' responsibility to review the original record to ensure that it contained all documents necessary for adequate appellate review, and failure to do so could result in a waiver.  *See id*. at 1. This Court requested that Counsel take the steps necessary to have the missing exhibits transmitted to this Court in a supplemental reproduced record within 14 days, or this Court would issue the briefing schedule and review the matter on the existing record.  *See id*. at 1-2.  The Burkholders did not submit a supplemental reproduced record.  This Court issued the briefing schedule on December 1, 2023.  Because the Burkholders filed their Reproduced Record on February 14, 2024, without the missing exhibits, this Court has not reviewed them.

[15] Husband's appeal was initially filed in the Pennsylvania Superior Court (Superior Court). According to the Burkholders' brief, despite that Husband's appeal was to be filed in this Court, the trial court directed it to the Superior Court.  *See* Burkholders' Br. at 9.  On March 1, 2023, the

6

Burkholders to file a Concise Statement of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b) (Rule 1925(b) Statement).  On January 11, 2023, the Burkholders filed their Rule 1925(b) Statement.[16]  On March 16, 2023, the trial court issued its opinion pursuant to Rule 1925(a) (Rule 1925(a) Opinion).[17]  By May 26, 2023 and July 28, 2023 Orders, this Court directed the parties to address the timeliness of the Burkholders' appeals in their principal briefs on the merits.

## Discussion

### 1. Timeliness

Pursuant to this Court's May and July 2023 Orders, this Court first addresses the timeliness of the Burkholders' appeals.  Section 5571(a) of the Judicial Code specifies that "[t]he time for filing an appeal . . . in . . . the Commonwealth Court shall be governed by general rules."  42 Pa.C.S. § 5571(a).  Rule 903(a) mandates that a notice of appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken."  Pa.R.A.P. 903(a).  Here, the trial court

---

Superior Court issued a rule to show cause why Husband's appeal should not be transferred to this Court.  The matter was transferred to this Court on March 16, 2023.

By November 9, 2023 Order, this Court consolidated the Burkholders' appeals and made them the designated appellants.

"On appeal from a summary conviction, where the trial court has taken additional evidence at a *de novo* hearing, [this Court's] . . . review is limited to determining whether the trial court abused its discretion or committed an error of law."  *Commonwealth v. Redovan*, 227 A.3d 453, 456 n.2 (Pa. Cmwlth. 2020).  "When presented with issues of statutory interpretation, this Court's standard of review is *de novo* and our scope of review is plenary."  *R.W. v. Dep't of Educ. (Pro. Standards & Pracs. Comm'n)*, 304 A.3d 79, 88 (Pa. Cmwlth. 2023), *appeal granted sub nom. R.W. v. Dep't of Educ.*, 321 A.3d 862 (Pa. 2024) (quoting *City of Johnstown v. Workers' Comp. Appeal Bd. (Sevanick)*, 255 A.3d 214, 221 (Pa. 2021) (italic emphasis added)).

[16] On January 20, 2023, the Commonwealth filed a response to the Burkholders' Rule 1925(b) Statement.

[17] In light of the trial court's Rule 1925(a) Opinion filing, and in the absence of Husband's response to the rule to show cause, the Superior Court *sua sponte* transferred Husband's appeal to this Court.

entered the sentencing orders convicting the Burkholders on November 17, 2022. Therefore, the Burkholders had until December 17, 2022, to file timely appeals. However, because December 17, 2022 was a Saturday, their appeals had to be filed in the trial court no later than Monday, December 19, 2022.[18] The Burkholders did not file their appeals until December 20, 2022.

The Burkholders' counsel (Counsel) admits that the Burkholders' appeals were untimely, *see* Burkholders' Br. at 25, but explains:

> On Friday December 16, 2022, Counsel submitted [a]ppeals by FedEx to be delivered on Monday[,] December 19[,] at 8:30 A[.]M. (See attached exhibit). Because the 30th day was a Saturday, a filing on December 19 would be timely. As this Court is aware, it is still not possible to file [a]ppellate [c]ourt appeals by PACFile. As there was no bad weather, only about 40 miles to travel, and an entire weekend in between submission and delivery, Counsel believed FedEx would do what it had been paid to do. FedEx failed, [and] the appeal was not delivered until December 20. FedEx did not notify [C]ounsel that it was not going to do what it was paid to do. Had [C]ounsel known that FedEx would fail, he would have driven to Lancaster himself with the appeal. Unfortunately[,] he knew nothing of this until well after the fact.
>
> Caselaw strongly suggests that a criminal defendant has the right to have a timely requested direct appeal adjudicated on the merits. *See*[,] *e.g.*[,] *Commonwealth v. Jordan*, . . . 772 A.2d 1011 [(Pa. Super. 2001)].
>
> In this case, [the Burkholders] did timely request a direct appeal. This [C]ounsel does believe that [the Burkholders] do[] have appeal issues that are of arguable merit.

---

[18] Section 1908 of the Statutory Construction Act of 1972 states: "Whenever the last day of any [statutory time] period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation." 1 Pa.C.S. § 1908.

This Counsel is requesting that this appeal be permitted to proceed.

If this appeal is not permitted to proceed, Counsel believes that the [Burkholders] ha[ve] a meritorious claim for either [Post Conviction Relief Act (]PCRA[)[19]] and/or *nunc pro tunc* appeal relief. It continues to be murky as to whether the PCRA does apply to cases in which a defendant is only ordered to pay fines and is not ordered to serve probation or incarceration.

The [a]ppellate [c]ourts of Pennsylvania have repeatedly found that criminal defendants should receive consideration of a timely requested direct appeal on the merits. It is therefore in the interests of [j]ustice to allow this appeal to proceed. [The Burkholders] do not believe that the Commonwealth would be prejudiced in any way by allowing this appeal to proceed to a determination on the merits.

Burkholders' Br. at 25-26 (italics added).

The Commonwealth retorts:

Counsel claims that he waited until the last possible day to send the appeal to the [trial court] via FedEx. Counsel then goes on to say that there were no environmental factors which would have prevented him or his staff at his firm to drive the appeal down to Lancaster, which is only 40 miles from his location. And yet despite all of that, Counsel places blame solely on FedEx.

. . . .

No exception should be made here, despite the blame placed on FedEx by Counsel. Counsel was aware of the deadline and despite this, chose to send in the appeal via mail knowing there are dangers associated with it. And as Counsel notes, there was nothing which prevented him, or his staff, from driving the 40 miles to Lancaster to file said appeal.

---

[19] 42 Pa.C.S. §§ 9541-9546.

Commonwealth Br. at 23-24. The Commonwealth cites *Windrick v. Commonwealth*, 471 A.2d 924 (Pa. Cmwlth. 1984), as an example that parties must be aware of the dangers of using mail in order to appeal.

> The law is well settled:
>
> "Where the legislature has fixed a time period within which an appeal may be filed, that period is **mandatory** and **may not be extended as a matter of grace or indulgence**." *Olson v. Borough of Homestead*, . . . 443 A.2d 875, 878 ([Pa. Cmwlth.] 1982) (emphasis added); *see also Hillanbrand v. P[a.] Bd. of Prob. & Parole*, . . . 508 A.2d 375 ([Pa. Cmwlth.] 1986); *Coshey v. Beal*, . . . 366 A.2d 1295, 1297 ([Pa. Cmwlth.] 1976) ("[T]he timeliness of an appeal goes to the jurisdiction of the body appealed to and its competency to act[.]").

*Arena Beverage Corp. v. Pa. Liquor Control Bd.*, 97 A.3d 444, 448 (Pa. Cmwlth. 2014) (emphasis omitted). However,

> "[a]n appeal *nunc pro tunc* is a recognized exception to the general rule prohibiting the extension of an appeal deadline. . . . [It] is intended as a remedy to vindicate the right to an appeal where that right has been lost due to certain extraordinary circumstances."[20] *Union Elec. Corp. v. Bd. of Prop. Assessment*, . . . 746 A.2d 581, 584 ([Pa.] 2000) (quotation marks omitted, emphasis added). "'[A]n appeal *nunc pro tunc* may be granted . . . in order to prevent injustice' in unique cases, 'upon a showing that unusual circumstances prevented a party from timely filing.[']'" *In re Borough of Riegelsville from Bucks Cnty. Bd. of Assessment & Revision of Taxes*, 979 A.2d 399, 402-03 (Pa. Cmwlth. 2009) (emphasis added) (quoting

---

[20] In civil matters, "a late appeal may be permitted only where the delay in the appeal was caused by extraordinary circumstances involving fraud or some breakdown in the administrative process, or non-negligent circumstances related to the appellant, his counsel[,] or a third party." *R.H. v. Dep't of Hum. Servs.*, 205 A.3d 410, 414 (Pa. Cmwlth. 2019). "A person seeking permission to file an appeal *nunc pro tunc* has the burden of establishing[:] (1) he filed the appeal within a short time after learning of and having an opportunity to address the untimeliness; (2) the elapsed period of time is of short duration; and (3) the [appellee] is not prejudiced by the delay." *Id*.

> *Hanoverian, Inc. v. Lehigh Cnty. Bd. of Assessment*, 701
> A.2d 288, 289 (Pa. Cmwlth. 1997)).

*Arena Beverage Corp.*, 97 A.3d at 448-49 (emphasis omitted).

In civil cases, the Pennsylvania Supreme Court has concluded that because mailing delays are foreseeable and avoidable, a counsel's failure to anticipate such delays is not a non-negligent circumstance for which an appeal *nunc pro tunc* may be granted. *See Criss v. Wise*, 781 A.2d 1156 (Pa. 2001). In criminal matters, however, the Pennsylvania Supreme Court has declared that a court abuses its discretion by denying leave to appeal *nunc pro tunc* from a summary conviction when counsel failed to appeal within the 30-day deadline because the appellant would otherwise lose the absolute right to a direct appeal guaranteed him by article V, section 9 of the Pennsylvania Constitution, PA. CONST. art. V, § 9.[21] *See Commonwealth v. Stock*, 679 A.2d 760 (Pa. 1996).

> The *Stock* Court explained:
>
> Were we to decide that [the a]ppellant could not appeal *nunc pro tunc* despite the fact that his state constitutional right to appeal was denied him, [the a]ppellant would have no other recourse. His conviction would stand and he would be without remedy. [The a]ppellant is not able to vindicate his right to appeal via the [PCRA] since he is not eligible to seek relief thereunder because he is not "incarcerated in this Commonwealth under a sentence of death or imprisonment or on parole or probation." 42 Pa.C.S.[] § 9543(2) (listing requirements to be eligible for relief under the PCRA) (emphasis added). In this regard, we find the reasoning of *In the Interest of A.P.*[, 617 A.2d

---

[21] Article V, section 9 of the Pennsylvania Constitution declares:

> There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law.

PA. CONST. art. V, § 9.

764 (Pa. Super. 1992) (en banc), *aff'd per curiam*, 639 A.2d 1181 (Pa. 1994)], persuasive and applicable herein. In *A.P.*, a juvenile was adjudicated delinquent and he alleged that he was denied his right to appeal due to counsel failing to timely file an appeal. In *A.P.*, the Superior Court reasoned[:]

> A.P. has no other means of redress; a *nunc pro tunc* appeal is the only means by which a juvenile can challenge the stewardship of his trial counsel because the [PCRA], *supra*, which would be the remedy for an adult is not available to a juvenile. *See In the Interest of DelSignore*, . . . 375 A.2d 803 ([Pa. Super.] 1977). . . . If the constitutional right to appellate review is to mean anything under these circumstances, it must be protected through a *nunc pro tunc* appeal.

> *A.P.*, . . . 617 A.2d at 768 . . . . Likewise here, if [the a]ppellant's state constitutional right to an appeal is to have any meaning and is to be vindicated, it can only be vindicated by granting him an appeal *nunc pro tunc*. Furthermore, it would be entirely unfair in the criminal context to permit [the a]ppellant's state constitutional right of an appeal to be extinguished solely on the basis of his counsel's failure to timely file the appeal where [the a]ppellant had requested an appeal to be filed. *Commonwealth v. Ciotto*, . . . 555 A.2d 930, 931 n.1 ([Pa. Super.] 1989) ("dismissal of post-verdict motions on the basis of a procedural default in a criminal case, like a similar dismissal of a criminal appeal, improperly places the entire burden of counsel's errors on the powerless" criminal defendant.)[.]

*Stock*, 679 A.2d at 764-65 (emphasis omitted; italics added).

*Stock* controls here. As in *Stock*, the trial court found the Burkholders guilty of summary offenses and sentenced them to pay fines. Their retained Counsel was to appeal from those convictions, but failed to timely do so. The Burkholders cannot seek PCRA relief because they were not sentenced to imprisonment and they are not on parole or probation. The only way to vindicate their constitutional rights

12

to direct appeals is to grant them leave to appeal their summary convictions *nunc pro tunc*. Accordingly, this Court grants the Burkholders' appeals *nunc pro tunc*.

## 2. Merits

Preliminarily, regarding the merits of the Burkholders' appeals, this Court observes that "[t]he Commonwealth has the never-shifting burden of proving all elements of a summary offense beyond a reasonable doubt." *Commonwealth v. Nicely*, 988 A.2d 799, 803 n.3 (Pa. Cmwlth. 2010); *see also Commonwealth v. Spontarelli*, 791 A.2d 1254 (Pa. Cmwlth. 2002).

> [This Court] must, therefore, view all of the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth. The test of sufficiency of evidence is whether the trial court, as trier of fact, could have found that each element of the offenses charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt.

*Spontarelli*, 791 A.2d at 1258 (citation omitted). Moreover, "matters of credibility and evidentiary weight are within the exclusive discretion of the fact-finder below[.]" *Carr v. State Bd. of Pharmacy*, 409 A.2d 941, 944 (Pa. Cmwlth. 1980). "[T]he fact-finder is free to believe all, part or none of the evidence presented." *Commonwealth v. Hoffman*, 938 A.2d 1157, 1160 n.10 (Pa. Cmwlth. 2007). Moreover, "[a]s a reviewing court, this Court may not reweigh the evidence and substitute [its] judgment for that of the fact-finder." *Id*.

At the *de novo* hearing in the instant matter, Warden Seiple testified that when the Department's team executed the search warrant at the Mohns Hill Road Property on May 27, 2020, Husband declared that there were no dogs at the

13

Mohns Hill Road Property or any other property that belonged to the Kennel.[22] *See* R.R. at 25a, 28a, 31a-32a. Warden Seiple also indicated that he asked the Burkholders for the Kennel's records and was told there were none, and the Department's team's search did not uncover any Kennel records at the Mohns Hill Road Property. *See* R.R. at 26a, 32a-33a. However, during their search, the Department's team discovered an empty 10-foot by 10-foot fenced enclosure with dog food bowls (one that contained food that was not fresh), but no dogs.[23] *See* R.R. at 26a. Warden Seiple's search uncovered a February 21, 2020 bill of sale for a male poodle signed by Wife, not the Kennel. *See* R.R. at 26a-27a. He also located a Kennel deposit ticket for $585.42, a receipt from Black Horse Animal Hospital made out to the Burkholders for "farm call/kennel," R.R. at 27a, and the following telephone messages: April 7, 2020, from Brenda Jones looking for puppies; April 11, 2020, discussing price range; from Tricia, asking what puppies were available; from Tracy Smith, stating a puppy died and she wanted a replacement; and from Jean, looking for a Cockalier puppy. *See* R.R. at 27a.

Warden Seiple indicated that the Department's team left the Mohns Hill Road Property and traveled to the Good Road Property, where they met and talked to Zimmerman, who confirmed that he purchased the Good Road Property from Husband. *See* R.R. at 27a-28a. Warden Seiple recalled Zimmerman disclosing that after he purchased the Good Road Property he found a large, locked structure at the back of the house (to which his son gained access by climbing over a wall and down through the ceiling) where he discovered 13 adult dogs. *See* R.R. at 28a. Warden

----

[22] The Burkholders revealed that there was an adult dog with three puppies at the Mohns Hill Road Property that belonged to their adult daughter, who later produced the proper records for those dogs. *See* R.R. at 26a-27a. Warden Seiple specified that the charges pending against the Burkholders did not include those four dogs. *See* R.R. at 31a.

[23] Warden Seiple also observed a large recreational vehicle, which Husband refused to unlock and the officers were unable to break open the door. *See* R.R. at 26a.

Seiple remembered Zimmerman stating that he called Husband, who informed him that he needed to house the dogs there for a few months while he built a new kennel on the Mohns Hill Road Property. *See id.* He further recollected Zimmerman's repeated declarations "that he's not taking care of these dogs, he's not in any way responsible for these dogs[, h]e wanted nothing to do with them[, a]nd . . . [Husband] would come periodically to care for [them]." *Id.*

Warden Seiple identified the Good Road Property kennel structure as the Kennel he had previously inspected during the Department's biannual license inspections.[24] *See* R.R. at 28a. He said that, after Zimmerman attempted to but was unsuccessful in reaching Husband by telephone, Zimmerman allowed the Department's team to search the Good Road Property Kennel. *See id.* Warden Seiple described finding nine adult dogs in the Kennel's facility. *See* R.R. at 28a, 31a. The Department's team photographed and documented everything they found at the Good Road Property.[25] *See* R.R. at 28a-30a. Warden Seiple indicated that Zimmerman contacted him approximately 7 to 10 days later, informed Warden Seiple that he finally reached Husband and demanded that Husband remove the dogs from the Good Road Property, which Husband eventually did. *See* R.R. at 30a-31a.

Warden Seiple testified that although he asked the Burkholders to supply records, including vaccine records, pertaining to the dogs located at the Good

---

[24] Section 218(a) of the Dog Law provides, in relevant part: "State dog wardens and employees of the [D]epartment shall inspect all licensed kennels within the Commonwealth at least twice per calendar year to enforce the provisions of th[e Dog Law] and regulations promulgated by the [D]epartment under th[e Dog Law]." 3 P.S. § 459-218(a); *see also* R.R. at 22a.

[25] Warden Seiple admitted that the Department's team allowed the dogs to remain at the Good Road Property on May 27, 2020, because the Department generally does not seize dogs. *See* R.R. at 32a. He later learned that Husband had promised Detective Resh that he would take care of the dogs and have them seen by a veterinarian for follow-up. *See* R.R. at 32a-33a. Dr. Ward confirmed that the Dog Law does not authorize the Department to seize dogs, but police officers, like Detective Resh, have such authority only if the dogs are in imminent danger of death. *See* R.R. at 38a. The dogs they found on May 27, 2020, were not in such danger. *See id.*

15

Road Property, the Burkholders did not produce any records until the day of the trial court hearing (November 17, 2022), when the Burkholders produced some vaccine and license records, but they did not identify the individual dogs and there was no way to match them to the dogs he uncovered at the Good Road Property. *See* R.R. at 30a, 33a. Warden Seiple explained that he had checked the state database to determine if the dogs at the Good Road Property were licensed and, while the database showed that there were 19 dogs licensed at the Good Road Property, he had no way to match the licenses to the dogs discovered on May 27, 2020. *See* R.R. at 30a. Warden Seiple also expressed that he was unable to obtain any documentation from the Burkholders regarding where Husband had relocated the dogs. *See id.* The trial court found Warden Seiple's testimony credible. *See* R.R. at 57a.

Dr. Ward testified that she accompanied Warden Seiple to the Kennel during numerous previous license inspections. *See* R.R. at 35a. Based on prior visits to the Kennel, she recalled that Husband would tour the Department's team through the Kennel while Wife obtained and produced the records and, if Wife was not present, Husband claimed that Wife maintained the records and he could not answer record questions. *See* R.R. at 78a-80a. Dr. Ward asserted that, in the past, the Burkholders maintained their Kennel records in a red notebook. *See* R.R. at 77a-78a.

Dr. Ward stated that she was present at the March 13, 2020 hearing where the judge and counsel encouraged the Burkholders to file the Kennel's closing application, and she was present during the May 27, 2020 search of the Mohns Hill Road Property. She recalled hearing Husband declare during the search that there were no dogs at the Mohns Hill Road Property or any other location that belonged to the Kennel. *See* R.R. at 35a, 40a. Dr. Ward specifically recollected asking the Burkholders for vaccination certificates and license information on May 27, 2020, but both refused to produce them or help look for them, and the Department's team

16

did not uncover the red notebook. *See* R.R. at 35a, 40a-41a. Dr. Ward also confirmed meeting with Zimmerman at the Good Road Property on May 27, 2020, and observing the Kennel and the dogs' conditions. *See* R.R. at 35a-38a.

Dr. Ward acknowledged receiving some Kennel records at the trial court hearing, but declared they were insufficient to satisfy the Rabies Act's statutory requirements (i.e., identification of the owner and the dog - including name, markings, color, age, gender, microchip - vaccine date, serial number, manufacturer, expiration, and veterinarian license, practice, and signature), the violations for which the Burkholders have been charged. *See* R.R. at 38a-40a. Dr. Ward described the records:

> A. . . . [I]f you just simply look at the first two certificates on this first page, everything is identical. It says Cavalier, tri-color. It has under 20 pounds, both of them. It says 12 months and older, both of them. Female, both of them. Dog, both of them. Name, none given. Any kind of identifying characteristics, none given. Any kind of microchip information or identification, not given.
>
> So[,] there's -- these are invalid in the sense that there is absolutely no way to distinguish the first dog from the second dog just looking at those first two.
>
> Q. I understand. If you flip to the very last page there in that packet.
>
> A. The last page?
>
> Q. Yes. I'm sorry. The fourth page, the bottom one there. Is there sufficient information on that bottom vaccine record?
>
> A. No, the bottom vaccine record doesn't even give you a breed. It doesn't give you age. It doesn't give you size. It doesn't give you gender. The bottom one doesn't even say if it's a dog or cat or other species, I can't even tell you whether or not this rabies certificate was even given to a dog.

Q. Can you tell -- the five pages of vaccine records, can you tell who issued these vaccines?

A. It looks like the name Willard Stoltzfus (Dr. Stoltzfus), a veterinarian that we've interacted with regularly.

Q. Is there anything else about these records that would be considered insufficient as using them as a rabies records?

A. Yes. The only thing that's confusing to me also is you're supposed to give yourit -- the address of the veterinarian that's supposed to be given is supposed to be the address where they practice. And for some reason it's -- a [post office (]P.O.[) B]ox is given as the address, which is not sufficient. Because if -- if the dog bites somebody and they need to go back to the vet[erinarian] to find, ask questions or get more information, they can't go to a P.O. [B]ox. So[,] you have to give an actual physical address on certificates so that the vet[erinarian] can be tracked down.

Q. You said that you're aware of [Dr.] Stoltzfus?

A. Yeah, it's unusual he would have done that. I don't know why -- every single one of these has a P[.]O[.] [B]ox in Parkesburg. It's unusual. I don't know why they were filled out that way but unfortunately it invalidates them.

R.R. at 39a-40a. The trial court found Dr. Ward's testimony credible. *See* R.R. at 57a.

Husband testified that when he decided to sell the Good Road Property and signed the agreement in mid-December 2019, he knew that he needed to move the Kennel, but he had nowhere to move it before he obtained the Mohns Hill Road Property in mid-March 2020.[26] *See* R.R. at 41a-42a. Husband described that he decided not to renew the Kennel License for 2020, discussed the process of closing

---

[26] Husband remarked that although the small, fenced-in area at the Mohns Hill Road Property could contain dogs, it was not suitable for them. *See* R.R. at 46a-48a.

18

the Kennel with the dog warden, and was aware that closing the Kennel required a closing inspection.  *See* R.R. 42a, 45a.

Husband declared that he personally owned the nine dogs found at the Good Road Property, and claimed that he had a verbal agreement with Zimmerman to rent the Kennel portion for the dogs until he could arrange another place to house them.  *See* R.R. at 43a-44a, 46a, 49a.  Husband maintained that he licensed each of those dogs by name in Lancaster County before the end of 2019 and had them vaccinated on December 27, 2019.  *See* R.R. at 42a, 44a, 46a, 49a.  He pronounced that he witnessed Dr. Stoltzfus vaccinate the dogs, and believed Dr. Stoltzfus would comply with the Rabies Act in completing the vaccination certificates.  *See* R.R. at 42a.  Husband admitted that although he named the dogs when he licensed them, he did not provide the dogs' names to Dr. Stoltzfus when they were vaccinated.  *See* R.R. at 49a-50a.  He further declared that his dogs' licenses only had to match their names while he operated the Kennel.  *See* R.R. at 46a.

Husband recounted Warden Seiple visiting the Good Road Property in March 2020, and referencing a closing inspection, but Husband declined to have one done that day on the basis that he did not renew the Kennel License, and he owned fewer than 26 dogs, so he was no longer operating the Kennel subject to the Dog Law.  *See* R.R. at 44a-45a.  Regarding the May 27, 2020 search, Husband stated that he opened the door for the Department's team and allowed it to conduct the search pursuant to the warrant.  *See* R.R. at 44a, 46a.  He further claimed that he exercised his right under United States Constitution Amendment V, U.S. CONST. amend. V., to remain silent and not incriminate himself; thus, he did not tell anyone that he had no dogs.  *See* R.R. at 43a-44a, 46a.  He also asserted that the Department's team did not ask about vaccination certifications, ownership, or transaction records for the dogs. *See* R.R. at 44a.  In addition, Husband revealed that he had vaccination records for the dogs at the Good Hill Road Property in March and May 2020, but did not

know why he did not produce them in advance of the trial court hearing. *See* R.R. at 49a.

Husband also recollected a conversation with Detective Resh after the May 27, 2020 search, during which she asked Husband to relinquish the dogs at the Good Road Property to unburden himself, but he declined, and the dogs remained there. *See* R.R. at 44a, 46a. He recalled Detective Resh visiting the Mohns Hill Road Property approximately 7 to 10 days later, but not whether there were dogs in the 10-foot by 10-foot enclosure at that time. *See* R.R. at 48a-49a. He testified that, at some point, Detective Resh told him if he produced proof of veterinary care for his nine dogs, she would not press charges. *See* R.R. at 44a. He attested that he thereafter arranged for Dr. Stoltzfus to check the dogs. *See id.* The trial court found Husband's testimony conflicting and evasive.[27] *See* R.R. at 57a.

Wife admitted that she maintained and updated the Kennel's records, but claimed that, despite her presence at the March 13, 2020 hearing and the May 27, 2020 search, she had not been asked to produce any records before the trial court hearing. *See* R.R. at 51a-52a. She also insisted that she was never asked to produce records regarding the transfer of the Kennel's numerous dogs before the end of 2019. *See* R.R. at 51a. Wife acknowledged that the Department's team presented the search warrant to her at the door on May 27, 2020, but did not read it to her, and she was not in the downstairs office when the team conducted the Kennel records search. *See id.* She declared that once Husband transferred the nine dogs at the Good Road Property to his individual ownership and had them vaccinated in December 2019, she no longer maintained the Kennel's records. *See* R.R. at 51a-52a. The trial court

---

[27] The trial court pronounced: "I find the testimony of [Husband] to be conflicting -- internally conflicting, evasive, lacking in credibility, self-serving[,] and crafted to his own convenience of the way in which he believes or would like to believe things should run for him as the laws and statutes apply." R.R. at 52a.

also found Wife's testimony "evasive" and lacking "any real credibility[.]" R.R. at 57a.

### a. Wife's Legal Interest

The Burkholders argue that Wife could not be convicted of any violations because she did not own or have a legal interest in the Kennel.

However, the Kennel License itself reflected that Wife was an LLC member and co-owned the Kennel with Husband. In addition, Warden Seiple explained that, although the Burkholders' counsel represented thereon that Wife was 0% owner, the intention of both the Burkholders and the Department was for Wife to have a sufficient ownership interest for her to represent the Kennel if Husband was not available for Department inspections and record requests. The evidence also established that Wife maintained the Kennel's records at least until December 2019.

Based on the evidence, the trial court concluded that Wife's "conviction of offenses for her role and participation in the Kennel was proper." Trial Ct. Rule 1925(a) Op. at 6 (R.R. at 94a). The trial court explained:

> [Wife] frequently maintained the records for [the Kennel]; thus, the percentage of ownership assigned to [her] on the [K]ennel['s] application form does not protect [her] from her criminal involvement because [her] conviction of offenses for her role and participation with the [K]ennel was proper.

> Dr. [] Ward . . . testified that it was [Wife] who worked on the [K]ennel's records and brought the records "[]down for us to review once the inspection at the [K]ennel finished," at every inspection Dr. Ward attended at the [K]ennel. [R.R. at 35a]. Dr. Ward also testified that [Wife] was the record keeper and maintained the records for [the K]ennel. Further, Dr. Ward testified that if [Wife] was not present during an inspection, [Husband] would state he did could [sic] not answer any questions pertaining to the records because [] [W]ife handles the records.

21

> [Warden Seiple] testified that although the 2019 [K]ennel [License] application submitted by [the] Kennel listed [Husband] as 100% owner and [Wife] as 0% owner, those percentages do not mean anything to the Department . . . because when there is more than one person listed on the [K]ennel [License] application as an owner the Department . . . will conduct an inspection as long as at least one of the owners listed on the application is present. [Warden] Seiple further testified that prior to 2019, [Husband] was the only owner listed for the [K]ennel; however, [Husband] was commonly unavailable when the Department . . . would arrive for [K]ennel inspections and as a result [Wife] was added as an owner in order for the Department . . . to conduct its inspections. The [trial] court was satisfied, based on the evidence and testimony, that the addition of [Wife] to the [K]ennel [License] application effectively made [her] an owner and operator of the [K]ennel. Thus, [Wife] had the same responsibilities and obligations as [Husband] in respect to compliance with the statute and providing information to the Dog Law enforcement officers.

*Id*. at 4-5 (R.R. at 92a-93a) (internal record citations omitted). The trial court found Wife's testimony "evasive" and lacking "any real credibility[.]" R.R. at 57a.

Viewing the evidence the trial court admitted into the record and all reasonable inferences therefrom in a light most favorable to the Commonwealth, as this Court must, *see Spontarelli*, this Court concludes that the trial court did not err by concluding that Wife owned and had a legal interest in the Kennel.

### b. Kennel Violations

The Burkholders next assert that because there was insufficient evidence that they were operating the Kennel in 2020 - i.e., they did not renew their Kennel License and did not have the number of dogs necessary to qualify as a kennel - the trial court could not convict them of violating Sections 206(e), 207(c), and 220(a)(3) of the Dog Law, and Section 8(a)(1) of the Rabies Act, all of which are limited to kennel operations.

22

Section 206(e) of the Dog Law mandates that any person who closes a kennel he/she keeps or operates "shall file an application with the [Department] notifying the [Department] of the . . . closure," and the Department "shall conduct a post[-]closure inspection." 3 P.S. § 459-206(e). Section 207(c) of the Dog Law provides:

> **Records to be maintained.--**Every keeper of a kennel shall keep, for two years, a record of each dog at any time kept in the kennel. Such record shall show:
>
> (1) The breed, color, markings, sex[,] and age of each dog.
>
> (2) The date on which each dog entered the kennel.
>
> (3) The full name and physical address at the time the dogs were received of the previous owner or kennel from whom the dog was received. This paragraph shall not apply to a boarding kennel.
>
> (4) The full name and physical address of the person or kennel to whom the dog belongs.
>
> (5) For what purpose each dog is kept in the kennel.
>
> (6) The date on which each dog leaves the kennel.
>
> (7) How the dog is dispensed. If the dog was transferred to another person or kennel, the record must state the full name and physical address of the person or kennel to whom the dog was dispensed.
>
> (8) The name, address[,] and telephone number of the licensed doctor of veterinary medicine used by the kennel. Such record shall be legible and shall be open to inspection and may be copied by any employee of the [D]epartment, [s]tate dog warden[,] or police officer as defined by th[e Dog Law].

3 P.S. § 459-207(c). Section 220(a) of the Dog Law specifies that "[i]t shall be a violation of th[e Dog Law] if a kennel refuses entry to an agent of the Commonwealth acting to enforce th[e Dog Law]." 3 P.S. § 459-220(a). The term

23

*refusal of entry* shall include "[h]iding a dog from an agent." 3 P.S. § 459-220(a)(3). Section 8(a)(1) of the Rabies Act states: "A person owning or keeping a dog . . . in this Commonwealth shall have the dog . . . vaccinated against rabies within [4] weeks after the date the dog . . . attains 12 weeks of age." 3 P.S. § 455.8(a)(1).

> The trial court held:
>
>> [Husband] failed to renew the [K]ennel [L]icense, [and] he also failed to conduct the required closing inspection with the Department . . . . Thus, . . . [the Burkholders' K]ennel had not been deemed closed and was still operational at the time of the offenses. As the undersigned stated at the summary appeal hearing[:] "Just because a license lapses doesn't excuse compliance with the [Dog L]aw in the convenient way that [Husband] would have it do. He knows that there's a requirement for a closure application and a closure inspection. He's just choosing not to do it." [R.R. at 56a.] Thus, [the Burkholders' K]ennel was not deemed closed and was still operational at the time of the offenses.

Trial Ct. Rule 1925(a) Op. at 4 (R.R. at 92a) (footnote omitted). Thus, the trial court extended the Burkholders' 2019 Kennel License to conclude that Sections 206(e), 207(c), and 220(a)(3) of the Dog Law, and Section 8(a)(1) of the Rabies Act applied to the Burkholders when they were charged.

However, the Dog Law makes clear that "[a] kennel license is required to keep or operate any kennel." 3 P.S. § 459-206(a)(4). Section 102 of the Dog Law defines a *kennel* as "[a]ny establishment in or through which at least 26 dogs are kept or transferred in a calendar year[.]" 3 P.S. § 459-102. In this case, the Burkholders did not renew the Kennel License for 2020 and, although the Burkholders housed more than 100 dogs at the Kennel prior to December 31, 2019, the record evidence reflected that there were only 9 dogs in the Kennel at the Good Road Property on May 27, 2020. There was no other credible evidence offered to

24

support that the Burkholders continued to operate the Kennel after December 31, 2019, or that they housed at least 26 dogs.[28]

Nevertheless, regardless of whether the Burkholders needed to apply for a 2020 kennel license, Husband's and Wife's convictions under Section 206(e) of the Dog Law were for failing to inform the Department and undergo a closing inspection related back to their obligations under their 2019 Kennel License. The record evidence supports that, despite Husband's awareness that Section 206(e) of the Dog Law required a closing inspection and Warden Seiple's offer twice in March 2020 to conduct a closing inspection, the Burkholders declined to comply with that statutory requirement, instead relying on *Commonwealth v. Lopez*, 908 A.2d 991 (Pa. Cmwlth. 2006), to claim that Section 206(e) of the Dog Law did not apply to them after the Kennel License expired on December 31, 2019.

The *Lopez* Court held that although the owner still cared for 34 dogs on the premises previously licensed as a kennel, the kennel no longer existed after the license expired. *See id*. at 996 ("In the absence of a valid kennel license, th[ere] was not a kennel."). However, because only dog licensing and vaccination violations - not Section 206(e) of the Dog Law's kennel closing requirements - were at issue in *Lopez*, it is inapposite here on that point.

Moreover, because kennel closing requirements must be determined by interpreting and applying Section 206(e) of the Dog Law, this Court looks to the Statutory Construction Act of 1972 (SCA),[29] the objective of which is to ascertain and effectuate the General Assembly's intent when enacting it. *See* Section 1921(a) of the SCA, 1 Pa.C.S. § 1921(a); *see also Commonwealth v. Rensel*, 315 A.3d 238

---

[28] The receipts and telephone messages the Department's team discovered at the Mohns Hill Road Property are not sufficient to establish that the Burkholders continued to operate the Kennel after the Kennel License expired because it could easily be related to pre-December 31, 2019 activity.

[29] 1 Pa.C.S. §§ 1501-1991.

(Pa. Cmwlth. 2024). "[W]hen the words of a statute have a plain and unambiguous meaning, it is th[at] meaning which is the paramount indicator of legislative intent." *Snyder Bros., Inc. v. Pa. Pub. Util. Comm'n*, 198 A.3d 1056, 1071 (Pa. 2018), *order amended on reconsideration*, 203 A.3d 964 (Pa. 2019). Section 206(e) of the Dog Law declares:

> **If a person that keeps or operates a kennel closes**, changes its name[,] or moves to another location, **the person shall file an application with the** [**Department**] **notifying the** [**Department**] **of the** move, **closure**, transfer[,] or change of name. **Upon approval by the** [**Department**], . . . the kennel license **may be allowed to remain in effect until the end of the calendar year** at which time it shall be renewed in accordance with th[e Dog Law]. **If a kennel is closing**, **the** [**Department**] **shall conduct a post**[-]**closure inspection**.

3 P.S. § 459-206(e) (emphasis added).

The General Assembly did not specify in Section 206(e) of the Dog Law that the closing notice filing or the inspection had to occur *before* a kennel license expires. Rather, the clear and unambiguous statutory language declares that the Department shall conduct a *post-closure* inspection and, since it authorized the Department to allow a kennel to continue operating until its license expires on December 31, regardless of when it receives notice, the General Assembly clearly anticipated Section 206(e) of the Dog Law to extend beyond a kennel license's expiration. Further, neither the General Assembly nor the *Lopez* Court could have intended, as the Burkholders suggest, to reward licensees who postpone or ignore kennel closing requirements until after their licenses expired by thereafter making them immune to Dog Law violations committed while they were licensed. In addition, Section 218(a) of the Dog Law declares, in pertinent part: "It shall be unlawful for any person to refuse admittance to such [s]tate dog wardens and employees of the [D]epartment for the purpose of making inspections and enforcing

26

the provisions of th[e Dog Law]." 3 P.S. § 459-218(a). Section 102 of the Dog Law defines *persons* to include individuals and other corporate forms, like LLCs. *See* 3 P.S. § 459-102 (*persons* are defined as "individuals, corporations, co[-]partnerships[,] and associations."). Accordingly, the fact that the Burkholders' Kennel License expired on December 31, 2019, did not preclude the trial court from thereafter convicting them of violating Section 206(e) of the Dog Law related to their 2019 Kennel License.

Similarly, Section 207(c) of the Dog Law required the Burkholders to "**keep**, **for two years**, a [detailed] record of each dog at any time kept in the kennel[,]" 3 P.S. § 459-207(c) (emphasis added), including transfer records for each dog removed therefrom, and such records "shall be legible and shall be open to inspection . . . by any employee of the [D]epartment, [s]tate dog warden[,] or police officer[.]" 3 P.S. § 459-207(c)(8). By its unambiguous language, the General Assembly clearly anticipated Section 207(c) of the Dog Law to extend two years beyond a kennel license's expiration. In addition, Section 218(b) of the Dog Law relating to Department inspections authorizes Department dog wardens "to inspect the records required under th[e Dog Law] of all licensed **and unlicensed kennels**." 3 P.S. § 459-218(b) (emphasis added). Accordingly, the fact that the Burkholders' Kennel License expired on December 31, 2019, did not preclude the trial court from thereafter convicting Husband for violations of Section 207(c) of the Dog Law stemming from the Kennel's operation under the 2019 Kennel License.

By extension, in order to conduct a post-closing inspection pursuant to Section 206(e) of the Dog Law, and to determine whether proper Kennel records were kept in accordance with Section 207(c) of the Dog Law, the Department would need to observe how many dogs the Kennel possessed at closing. Section 218(a) of the Dog Law authorizes the Department to enforce the Dog Law's provisions, including "inspect[ing] . . . all dogs within the Commonwealth" and determining

27

whether "unlicensed establishments[30] . . . are operating as a kennel . . . ." 3 P.S. § 459-218(a). Thus, it reasonably follows that, in Section 220(a)(3) of the Dog Law, the General Assembly intended to prohibit Husband from hiding dogs from the Department's team both before and after the Kennel License expired. Accordingly, the fact that the Burkholders' Kennel License expired on December 31, 2019, did not preclude the trial court from thereafter convicting Husband of violations of Section 220(a)(3) of the Dog Law stemming from the Kennel's operation under the 2019 Kennel License.

Finally, Section 8(a)(1) of the Rabies Act applies to persons "owning or keeping a dog[.]" 3 P.S. § 455.8(a)(1). Section 102 of the Dog Law similarly states:

> When applied to the proprietorship of a dog, [the term *owner*] includes every person having a right of property in such dog, and every person who keeps or harbors such dog

---

[30] In relevant part, Section 102 of the Dog Law defines *establishment* as:

> (1) The premises on, in[,] or through which **a dog is kept**, bred, harbored, boarded, sheltered, maintained, sold, given away, exchanged[,] or in any way transferred.

> (2) The term shall encompass all of the following on, in[,] or through which any of the activities under paragraph (1) take place:

>> (i) **The home**, **homestead**, place of business[,] or operation **of a person**, including a dealer, which includes all of the land, property, housing facilities or any combination of land, property[,] or housing facilities of the individual or person.

>> (ii) All of the persons residing in or on the establishment.

>> (iii) **A person**, organization, business[,] or operation **which utilizes offsite** or rescue network **kennel homes** to keep, maintain, breed, train, harbor, board, shelter, sell, give away, adopt, exchange[,] or in any way transfer dogs.

3 P.S. § 459-102 (emphasis added).

> or has it in his care, and every person who permits such dog to remain on or about any premises occupied by him.

3 P.S. § 459-102. Thus, Section 8(a)(1) of the Dog Law imposes a duty on *all* dog owners/keepers, not just licensed kennels,[31] to vaccinate their dogs against rabies. Accordingly, regardless of whether the Burkholders ever held a kennel license, the trial court could convict them for violations of Section 8(a)(1) of the Rabies Act if their dogs are not properly vaccinated.[32]

This Court disagrees with the trial court's conclusion that the Kennel remained operational simply because the Burkholders did not fulfill the Dog Law's closing protocols. The trial court did not cite to any fact or law to support that conclusion, and the Commonwealth did not produce any evidence that the Burkholders kept or transferred at least 26 dogs after their Kennel License expired on December 31, 2019, *see* 3 P.S. § 459-102, nor did the Commonwealth charge the Burkholders for operating the Kennel in 2020 without a valid license. Notwithstanding, viewing the evidence the trial court admitted into the record and all reasonable inferences therefrom in a light most favorable to the Commonwealth, as this Court must, *see Spontarelli*, sufficient record evidence supported the trial court's convictions of the Burkholders for violating Sections 206(e), 207(c), and 220(a)(3) of the Dog Law, and Section 8(a)(1) of the Rabies Act, despite that their 2019 Kennel License had expired.[33]

---

[31] "Although dogs in a licensed kennel need not have individual licenses under Sections 206 and 207 of the Dog Law, all dogs must be vaccinated for rabies[.]" *Lopez*, 908 A.2d at 995 n.5.

[32] The Commonwealth did not charge the Burkholders with violating Section 8(a)(2) of the Rabies Act, which states, in pertinent part: "A person owning or keeping a dog . . . that is required to be vaccinated against rabies shall produce either proof of vaccination, or exemption status under subsection (f), within 48 hours after a police officer, [s]tate dog warden, [D]epartment official or designated municipal animal control officer requests the proof." 3 P.S. § 455.8(a)(2).

[33] "This Court may affirm a trial court's order on any basis appearing in the record." *Washington v. Dep't of Transp., Bureau of Driver Licensing*, 301 A.3d 982, 985 (Pa. Cmwlth. 2023).

29

### c. Rabies Act Convictions

The Burkholders further contend that there was insufficient evidence for the trial court to convict them of Rabies Act violations after they provided evidence that the dogs discovered at the Good Road Property on May 27, 2020, had been vaccinated against rabies and, further, that Wife did not own those dogs.

The trial court concluded that the Burkholders' Rabies Act violations were properly asserted against them as owners of the Kennel. *See* Trial Ct. 1925(a) Op. at 7. The trial court found Dr. Ward's testimony credible and found Husband's testimony conflicting and evasive,[34] *see* R.R. at 57a, and explained:

> [T]he [trial] court found that [the Burkholders' K]ennel had not been deemed closed and was still operational at the time of the offenses and that both [Husband and Wife] were owners and operators of the [K]ennel with the same responsibilities and obligations in respect to compliance with the statute and providing information to the Dog Law enforcement officers. Dr. Ward testified that the nine rabies vaccine certificates, which [the Burkholders] provided the day of the hearing on November 17, 2022, were insufficiently completed and Dr. Ward considered the certificates invalid. Specifically, Dr. Ward testified that the certificates . . . failed to provide the proper information in which to distinguish the dogs from each other by failing to identify breed information, age, gender or size. Further, Dr. Ward testified that one vaccine record failed to even identify whether the animal was a dog or cat or other species; thus, Dr. Ward stated, "[] I can't even tell you whether or not this rabies certificate was even given to a dog." [R.R. at 39a]. Dr. Ward also testified that the address of the veterinarian who issued the vaccines listed a P.O. Box rather than the address of the veterinarian's practice as required. The [trial] court's review of the vaccine certificates, which [the Burkholders] did not provide until the day of the hearing, coupled with the

---

[34] As previously stated, the trial court pronounced: "I find the testimony of [Husband] to be conflicting -- internally conflicting, evasive, lacking in credibility, self-serving[,] and crafted to his own convenience of the way in which he believes or would like to believe things should run for him as the laws and statutes apply." R.R. at 52a.

30

testimony of Dr. Ward[,] sufficiently support the [trial] court's determination that the rabies vaccine certificates were invalid because the [trial] court found that [the Burkholders] failed to provide the vaccine certificates in a timely or compliant manner and that the accuracy of the certificates were questionable[.[35]]

*Id*. at 6-7 (R.R. at 94a[36]) (internal record citations omitted); *see also* R.R. at 57a.

Because the Rabies Act violation is supported by sufficient record evidence, this Court finds no error in the trial court's conclusion as to Husband. However, as stated above, Section 8(a)(1) of the Rabies Act requires owners/keepers to have dogs vaccinated against rabies, regardless of whether they hold kennel licenses. In this case, the Burkholders were specifically convicted for not vaccinating the nine dogs the Department's team discovered at the Good Road Property on May 27, 2020. Based on this Court's review of Warden Seiple's, Dr. Ward's, and Zimmerman's credited testimony, Husband individually owned those

---

[35] At the trial court hearing, the trial court declared:

> One of the things that sticks out to me very broadly is [sic] the rabies vaccination certificates for nine dogs. And the 18 dogs listed on the registration to [Husband], all of those dogs have names. None of the rabies vaccination certificates have names. And I find that to be a gap in credibility that is almost impossible to cross.
>
> I also find based on Dr. Ward's testimony that a licensed veterinarian such as [Dr.] . . . Stoltzfus would put a P.O. [B]ox down as his address when he would know as a licensed veterinarian that it is his physical office address that needs to go in that spot. The fact that there are no names, as I said earlier, on the rabies vaccination certificates that match up with any of the dogs that were registered to [Husband] is suspicious in my estimation. And he has been doing this long enough to know that there's a procedure to do things and a way to do things. And simply stating he didn't ask for it or I didn't think to give it to him isn't good enough when you've been in business for as long as [Husband] has.

R.R. at 57a.

[36] Although page 7 of the Trial Court's Rule 1925(a) Opinion was included in the trial court's original record, it was missing from the Reproduced Record.

dogs as of December 2019, the Burkholders moved to the Mohns Hill Road Property in mid-March 2020, and Husband alone cared for the dogs at the Good Road Property thereafter. The Commonwealth did not present any evidence that those dogs were unvaccinated under the 2019 Kennel License, that Wife thereafter had a property right in those dogs, that she kept, harbored, or had them in her care, or that she occupied the Good Road Property with them on May 27, 2020. *See* 3 P.S. § 459-102. In the absence of evidence that Wife owned or kept the nine dogs at the Good Road Property on May 27, 2020, with a corresponding duty to have them vaccinated against rabies pursuant to Section 8(a)(1) of the Rabies Act, the trial court erred by convicting Wife for violating Section 8(a)(1) of the Rabies Act on that basis.

Accordingly, viewing the evidence the trial court admitted into the record and all reasonable inferences therefrom in a light most favorable to the Commonwealth, as this Court must, *see Spontarelli*, this Court concludes that there was sufficient evidence for the trial court to convict Husband, but not Wife, of violating the Rabies Act.

### d. Husband's Interference Conviction

The Burkholders further maintain that there was insufficient evidence for the trial court to convict Husband of interference when the definition of interference is unclear/vague and there was no proof of intentional acts of interference.

The Commonwealth framed Husband's interference charge as follows:

[Husband] did interfere with [s]tate [d]og [w]ardens in the performance of their duties. To wit: At the inspection on May 27, 2020, [Husband] did hide nine dogs from [d]og [w]ardens. [Husband] also hid kennel records showing 13 dogs in the kennel. [Husband] also interfered with [Warden Seiple's] attempt to complete a closing kennel inspection.

32

R.R. at 3a. Based on the evidence presented before it, the trial court concluded that there was sufficient evidence to support Husband's conviction for interference. *See* Trial Ct. 1925(a) Op. at 9 (R.R. at 96a).

Section 401(c) of the Dog Law provides: "It shall be unlawful for any person to interfere with any officer or employee of the [D]epartment in the enforcement of this [Dog L]aw." 3 P.S. § 459-401(c). Section 102 of the Dog Law defines *persons* to include individuals and LLCs. *See* 3 P.S. § 459-102. This Court acknowledges that the Dog Law does not define the term *interfere*. However, pursuant to Section 1903 of the SCA, undefined words in a statute "shall be construed according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. § 1903(a). "We generally use dictionaries as source material for determining the common and approved usage of a term." *R.W. v. Dep't of Educ. (Pro. Standards & Pracs. Comm'n)*, 304 A.3d 79, 88 (Pa. Cmwlth. 2023), *appeal granted sub nom. R.W. v. Dep't of Educ.*, 321 A.3d 862 (Pa. 2024). Merriam-Webster's online dictionary defines *interfere* as "to interpose in a way that hinders or impedes[;] come into collision or be in opposition[.]"[37] Such definition is not so unclear/vague in this context as to be unenforceable.

The credible record evidence established that Warden Seiple attempted to conduct closing inspections for the Kennel on March 6 and May 27, 2020. During the March 6, 2020 visit, Husband declined the closing inspection and refused to complete the Kennel's closing application. Husband again refused to complete the closing application at Warden Seiple's request on March 13, 2020. Husband and Wife did not produce, when requested at the May 27, 2020 inspection, any Kennel records whatsoever - let alone records for the 13 dogs Zimmerman declared he discovered at the Good Road Property in March 2020, or the vaccination certificates

---

[37] www.merriam-webster.com/dictionary/interfere (last visited Feb. 21, 2025).

and/or licenses for the 9 dogs remaining at the Good Road Property on May 27, 2020, the latter of which Husband later admitted he possessed all along. Moreover, the trial court accepted as credible Warden Seiple's and Dr. Ward's testimony that at the May 27, 2020 inspection, Husband represented to the Department's team that he did not have any dogs at the Mohns Hill Road Property or the Good Road Property. Husband's actions/inactions clearly "hinder[ed] or impede[d]" "came into collision" with or "oppos[ed]" the Department's statutory responsibilities.

Viewing the evidence the trial court admitted into the record and all reasonable inferences therefrom in a light most favorable to the Commonwealth, as this Court must, *see Spontarelli*, this Court concludes that the trial court did not err by concluding that there was sufficient evidence to support Husband's conviction for interference.

### e. Husband's False Statement Conviction

Lastly, the Burkholders pronounce that there was insufficient evidence for the trial court to convict Husband of false statements in the absence of evidence that he made any intentionally false statements.[38]

---

[38] In the portion of their brief addressing Husband's false statement conviction, citing *Commonwealth v. Mach Transport, LLC*, 305 A.3d 22 (Pa. Super. 2023), the Burkholders also assert that the Commonwealth ignored that the Kennel was a separate legal entity that could have been the defendant in these criminal charges. *See* Burkholders' Br. at 22-23. This Court acknowledges that Section 8818(a) of the Pennsylvania Uniform Limited Liability Company Act of 2016 (PULLCA) states: "A limited liability company is an entity distinct from its member or members." 15 Pa.C.S. § 8818(a); *see also* Section 8811(c) of the PULLCA, 15 Pa.C.S. § 8811(c) (The PULCCA governs all limited liability companies as of April 1, 2017, regardless of when they were established.). However, **equity allows a court to look beyond an LLC's form**

> **"whenever justice or public policy demand**[,]" *Ashley v. Ashley*, . . . 393 A.2d 637, 641 ([Pa.] 1978), **such as when the corporate form has been used to** "defeat public convenience, **justify wrong, protect fraud, or defend crime**." *Mosaica Educ.,*

34

Section 801 of the Dog Law declares: "It is unlawful for any person knowingly to make any false statement or to conceal any fact required to be disclosed under any of the provisions of th[e Dog Law]." 3 P.S. § 459-801. Section 102 of the Dog Law defines *person* to include individuals and LLCs. *See* 3 P.S. § 459-102. The record evidence supports, and the trial court found credible, Warden Seiple's and Dr. Ward's testimony that Husband represented to the Department's team on May 27, 2020, that there were no dogs at the Mohns Hill Road Property or any other location that belonged to the Kennel, when he maintained nine dogs previously owned by the Kennel at the Good Road Property. *See* R.R. at 57a-58a.

Based on the evidence, the trial court concluded that it properly convicted Husband of making false statements. *See* Trial Ct. 1925(a) Op. at 10 (R.R. at 97a). The trial court reasoned:

> As previously discussed, [the Burkholders] did not comply with closing the [K]ennel pursuant to the rules and regulations required by the Department . . . . Thus, on May 27, 2020, [Husband] made intentionally false statements to [Warden] Seiple when he told [Warden] Seiple that he did not own any dogs at any location at that time when, in fact, there were dogs under his care being kept at his previous [K]ennel property. A [sic] such, the evidence and credible testimony supports the [trial] court's determination that [Husband's] failure to produce records showing dogs in his possession as opposed to [the] Kennel's possession coupled with [Husband's] statement that [the] Kennel did not own any dogs al [sic] any location evident of [Husband] making false statements to [Warden] Seiple[.]

Inc. [*v. Pa. Prevailing Wage Appeals Bd.*], 925 A.2d [176,] 184 [(Pa. Cmwlth. 2007)].

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1035 (Pa. 2018) (emphasis added). Accordingly, the mere fact that the Kennel was an LLC did not prohibit the Commonwealth from individually charging the Burkholders under the circumstances presented in this particular case.

35

*Id*. at 9-10 (R.R. at 96a-97a).

Viewing the evidence the trial court admitted into the record and all reasonable inferences therefrom in a light most favorable to the Commonwealth, as this Court must, *see Spontarelli*, this Court concludes that the trial court properly convicted Husband of making false statements.

**Conclusion**

Because the trial court properly held that the Commonwealth proved by sufficient evidence beyond a reasonable doubt that Husband violated Sections 206(e), 207(c), 220(a)(3), 401(c), and 801 of the Dog Law, and Section 8(a)(1) of the Rabies Act, this Court affirms Husband's sentencing order.

Because the trial court properly held that the Commonwealth proved by sufficient evidence beyond a reasonable doubt that Wife violated Section 206(e) of the Dog Law, this Court also affirms Wife's sentencing order relative to that conviction. However, because the trial court erred by ruling that the Commonwealth proved by sufficient evidence beyond a reasonable doubt that Wife violated Section 8(a)(1) of the Rabies Act, this Court reverses that portion of Wife's sentencing order and remands this matter for the trial court to modify Wife's sentence accordingly.

_____
ANNE E. COVEY, Judge

36

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CASES CONSOLIDATED |
| | : | |
| v. | : | |
| | : | |
| Diane L. Burkholder, | : | |
| Appellant | : | No. 1526 C.D. 2022 |
| | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| v. | : | |
| | : | |
| James E. Burkholder, | : | No. 615 C.D. 2023 |
| Appellant | : | |

## O R D E R

AND NOW, this 24th day of February, 2025, the Lancaster County Common Pleas Court's (trial court) November 17, 2022 sentencing order for James E. Burkholder is AFFIRMED.

The portion of the trial court's November 17, 2022 sentencing order convicting Diane L. Burkholder (Wife) of violating Section 206(e) of the Dog Law, Act of December 7, 1982, P.L. 784, *as amended*, 3 P.S. § 459-206(e), is AFFIRMED. The portion of the trial court's order convicting Wife of violating Section 8(a)(1) of the Rabies Prevention and Control in Domestic Animals and Wildlife Act, Act of December 15, 1986, P.L. 1610, *as amended*, 3 P.S. § 455.8(a)(1), is REVERSED, and this matter is REMANDED for the trial court to modify Wife's sentence accordingly.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge